IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

HAROLD MOODY,

                            Plaintiff,

                                             Civ. Action No.
                                             9:03-CV-850 (DEP)

      vs.

DR. ROBERT F. PICKLES, *et al.*,

                            Defendants.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

MENTER, RUDIN LAW FIRM[1]      STEVEN B. ALDERMAN, ESQ.
500 South Salina Street         ROGER BENNETT, ESQ.
Suite 500
Syracuse, NY 13202

FOR DEFENDANTS:

HON. ELIOT SPITZER_____ED J. THOMPSON, ESQ.
ATTORNEY GENERAL
State of New York
The Capitol
Albany, New York 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

_____

      [1]      The Menter Rudin firm was assigned to represent the plaintiff in this matter *pro bono*.  The court appreciates the extensive energy and effort expended on plaintiff's behalf by the attorneys designated by that firm to handle the case.

## DECISION AND ORDER

Plaintiff Harold Moody, a former New York State prison inmate who until recently was proceeding *pro se* and *in forma pauperis* but is now represented by *pro bono* counsel, commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his constitutional rights.  Plaintiff's claims, as narrowed by earlier decisions from this court, include a cause of action alleging deliberate indifference to his serious medical needs by virtue of a failure by one of the defendants to follow instructives from a medical colleague to order magnetic resonance imaging ("MRI") testing of Moody's knee and place him in the prison infirmary, in violation of his Eighth Amendment rights, and his assertion that defendants' ongoing failure to properly treat his knee condition was motivated out of retaliatory animus based upon complaints registered regarding his treatment, thus infringing upon his First Amendment rights.

A non-jury trial was held before me in connection with this action on August 14, 2006.[2] This decision represents my findings of fact and

---

[2]        The parties have consented to my jurisdiction to address the dispositive aspects of the case, pursuant to 28 U.S.C. § 636(c).  *See* Dkt. No. 61.  Additionally, although jury demands were initially filed by both sides, the parties later stipulated to a bench trial. Dkt. No. 65.  These agreements by the parties were confirmed on the record at the outset of the trial.

conclusions of law, based upon the evidence adduced during that trial.

I.    BACKGROUND

At the times relevant to his claims, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's incarceration stemmed from a conviction for weapons possession and attempted robbery, resulting in the imposition of a determinate, ten year sentence.

On December 21, 2002, while confined within the Oneida Correctional Facility ("Oneida"), Moody was seen by a nurse at the facility's infirmary, complaining of a right knee injury suffered when standing up from his dormitory room bed on the previous day. Although plaintiff reported experiencing both discomfort and swelling, no swelling, bruising or discoloration was observed by the nurse during that visit. Following an examination of his knee, plaintiff was given an Ace wrap and a one day excuse from mess hall duty, and was instructed to sign up for sick call on December 23, 2002.

Plaintiff returned to the clinic, as instructed, on December 23, 2002 and was seen by another nurse on that occasion. Once again, no swelling was discerned during the course of that visit. Plaintiff was advised by the

examining nurse to rest and apply ice to his knee, and was given a work

excuse for the day as well as an analgesic balm, to be applied as needed.[3]

Although the records are somewhat equivocal on this score, in that

there is no record of the visit, it appears based upon a subsequent AHR

entry that plaintiff was taken to the prison clinic by van for treatment of his

knee on December 25, 2002.  On that date, plaintiff was advised to continue

using ice and taking Motrin, and to elevate his knee, but was told that there

was nothing more that could be done until his condition was evaluated by a

doctor.

Plaintiff was next seen at the Oneida infirmary for his right knee

condition on January 2, 2003, again by a registered nurse.  During her

examination the nurse observed some swelling of the inner aspect of

plaintiff's right knee, as well as tenderness in the patella region.  An x-ray of

plaintiff's knee was ordered, and he was given an elastic knee support and

permit for its use until April 2, 2003.  Moody was also advised during that

session to apply ice or warm, moist soaks, and was again provided with an

---

[3]    It was also noted in an entry from that date recorded in plaintiff's
Ambulatory Health Record ("AHR"), a compilation of medical records maintained by
the DOCS with respect to each inmate, that Moody was already on Motrin, which had
been prescribed on October 28, 2002 for unrelated pain symptoms.

analgesic balm to apply as needed.[4]  Plaintiff was advised during that visit to return to the clinic as needed for further treatment.

An x-ray was taken on January 2, 2003 of plaintiff's right knee.  The results of that x-ray reflected that "[b]ones and joints are within normal limits. There is no joint effusion."

On January 14, 2003, Moody was seen at the Oneida clinic by defendant Gloria Janicki, a nurse practitioner.  At the time Janicki, together with two DOCS physicians, Dr. Robert F. Pickles and Dr. Raja Mara, were assigned primary responsibility to see and treat inmates at Oneida with medical conditions.  Those duties were apportioned among Dr. Mara, Dr. Pickles and Nurse Practitioner Janicki based upon the days of the week, with Dr. Pickles generally on duty on Tuesdays and Wednesdays, and defendant Janicki ordinarily covering Thursdays and Fridays.

After experiencing some difficulty in performing the requisite tests on plaintiff's right knee, as a result of Moody's weight, Nurse Practitioner Janicki requested that Dr. Pickles assist in the examination.[5]  During his brief examination of plaintiff's knee on that occasion, Dr. Pickles observed

---

[4]        It was again noted in the entry regarding that visit that plaintiff had a prescription from October 28, 2002 for Motrin 600 mg.

[5]        At the time of that examination, plaintiff weighed nearly 300 pounds.

5

some positive valgus stress, and noted that medial collateral ligament strain should be ruled out.  Following the examination plaintiff was again provided with an Ace wrap and knee brace, as well as a cane for ambulation, and was excused from participation in programs.  Plaintiff was advised to return to the clinic in one week, and an appointment for January 21, 2003 was accordingly scheduled.

Central to plaintiff's claims is his contention that he was a patient of Dr. Pickles, who during the January 14, 2003 examination directed Nurse Practitioner Janicki to order immediate MRI testing of plaintiff's knee, and to place him in the infirmary in order to immobilize the affected knee.[6]  Having considered carefully the testimony of Nurse Practitioner Janicki and Dr. Pickles, as well as that of the plaintiff, I find that both during and following that examination, plaintiff was regarded as defendant Janicki's patient.  In addition, I find that no such directions were given by Dr. Pickles during that

---

[6]     The fact that January 14, 2003 was a Tuesday is to some degree supportive of plaintiff's contention that he was a patient of Dr. Pickles, rather than of Nurse Practitioner Janicki, a claim which is somewhat pivotal to his deliberate indifference cause of action.  No explanation appears in the record, however, of the need for defendant Janicki's involvement in plaintiff's examination, if that were the case, given the system in place at the facility's infirmary.  Dr. Pickles also noted that although she is a nurse practitioner and he is a physician, he views defendant Janicki as a co-equal rather than considering himself as her superior when it comes to treating patients, adding that his assistance was elicited in plaintiff's case solely as a result of Nurse Practitioner Janicki's inability to perform the requisite testing due to plaintiff's size and weight.

brief session.  As Dr. Pickles explained, an MRI is an expensive procedure which he would order done only if surgical intervention were warranted. According to Dr. Pickles, surgery, in turn, would only be considered by him as a treatment option in the event of immobility of the knee, something which the doctor did not observe in the plaintiff's case.  Given these circumstances, and the finding that Dr. Pickles regarded Moody as defendant Janicki's patient, I reject as implausible plaintiff's contention that those two instructives were given by Dr. Pickles on January 14, 2003, as alleged.

Although there is no AHR entry for this date, it appears that plaintiff returned to the clinic, as directed, on January 21, 2003, continuing to complain of knee pain, and again was seen by Nurse Practitioner Janicki. While plaintiff contends that he also saw Dr. Pickles on that occasion, Dr. Pickles recalls seeing the plaintiff only once, and there is no written record to support this contention.[7]  During that visit, plaintiff complained of experiencing continued difficulties, including with respect to walking and climbing stairs, and asked to be excused from his mess hall work

---

[7]     Since plaintiff saw Nurse Practitioner Janicki on that date, and no reason has been offered or appears from plaintiff's records for another consultation with Dr. Pickles at the time, I do not credit plaintiff's statements in this regard.

7

assignment.  Plaintiff's request for a work excuse was denied by Nurse Practitioner Janicki, due in part to the fact the he was able to ambulate through use of a cane.

On February 22, 2003 plaintiff was seen by a registered nurse at the Oneida clinic after having reportedly slipped on water on the mess hall floor and fallen, twisting his right knee.  The examining nurse noted that plaintiff already had been provided with a knee support and a cane permit, and that an MRI was scheduled for plaintiff's knee on February 24, 2003.  A report of the injury was completed and filed, and plaintiff was given a work excuse through February 25, 2003.

On February 24, 2003, plaintiff underwent an MRI examination of his right knee, conducted by After-Hours Mobile Imaging, located in Hunt, New York.[8]  That MRI revealed some moderate joint effusion, a medial meniscal tear involving body/posterior horn, and some bone contusion of the medial tibial plateau.

---

[8]      It is unclear from the record where the MRI was administered.  Dr. Pickles stated that while there is an x-ray machine in Oneida, the facility does not have MRI capabilities.  During his testimony Dr. Pickles noted his belief that in 2003 there was MRI testing equipment located in the Walsh Regional Medical Center, within the Marcy Correctional Facility and adjacent to Oneida.  The report completed by Dr. Victor Regenbogen regarding plaintiff's MRI, however, fails to disclose where the testing was administered.

Plaintiff was seen on February 25, 2003 by Nurse Practitioner Janicki, principally for a skin condition.  In her AHR entry relating to that visit, defendant Janicki noted that plaintiff had undergone an MRI of his right knee, and was scheduled for an orthopedic consultation concerning his knee, and that Moody reported that he "tires of any long distance walking."  A request for orthopedic consultation was submitted by Nurse Practitioner Janicki to appropriate DOCS personnel on February 25, 2003.

On April 2, 2003 plaintiff was again seen by Nurse Practitioner Janicki for complaints associated with his right knee condition.  On that date, plaintiff for the first time reported experiencing throbbing pain at night.[9]  As a result of that complaint plaintiff was placed in the prison infirmary, and corrections officers were dispatched to Moody's dormitory to retrieve his medications, including the previously-prescribed Motrin.[10]  Plaintiff was again seen by Nurse Practitioner Janicki on April 11, 2003, complaining of continued throbbing pain in certain positions.  During that examination, plaintiff expressed a desire to leave the infirmary, but was nonetheless kept

---

[9]     Nurse Practitioner Janicki's AHR entry from that date characterizes this as a new development, noting that plaintiff's previous complaints involved pain experienced when walking for any distances.

[10]    Although his AHR does not reflect this fact, according to the plaintiff he was admitted into the Oneida infirmary on March 28, 2003.

9

there in light of his pain complaints.

Plaintiff was examined by Dr. Thomas Smallman, an orthopedic consultant, on April 16, 2003.  Based upon his examination Dr. Smallman diagnosed plaintiff as suffering from a medial meniscus tear, and recommended that he undergo arthroscopic surgery to repair the damage.

Plaintiff was next seen at the clinic for his knee condition by Nurse Janicki on April 18, 2003.  At that time, Moody appeared to be ambulating without difficulty and related that he could walk for short periods without experiencing problems, and that it was only when he walked long distances that his knee bothered him.  Nurse Practitioner Janicki noted in her AHR entry from that date that plaintiff was not any longer using his cane.

Plaintiff was again seen by Nurse Practitioner Janicki on April 21, 2003, asking that he be allowed to return to the general population.  During that visit plaintiff reported feeling good and not experiencing pain, and stated that he was able to ambulate with no difficulty, and without the use of a cane.  It was noted in the AHR entry from that date that plaintiff requested transfer into a "flat facility" which would obviate the need to use stairs.[11] Reports of subsequent visits by plaintiff to see medical personnel at Oneida

---

[11]     Plaintiff was subsequently transferred into the Marcy Correctional Facility, a single level prison, on or about May 7, 2003.

on April 25, 27, and 30, 2003, as well as on May 5, 2003, make no mention of plaintiff's knee condition.

Arthroscopic surgery was subsequently performed by Dr. Smallman at the State University of New York at Upstate, located in Syracuse, New York, on May 27, 2003 to repair plaintiff's knee.  There is no indication from the testimony adduced at trial or in his medical records that plaintiff's condition worsened, or that the surgery was made more difficult, as a result of the intervening period between December 21, 2002, when Moody first reported his symptoms, and the date upon which the operation was performed.

Over the course of time plaintiff expressed concerns and registered complaints with various prison officials, both directly and through the established grievance process, concerning his medical treatment.[12]  On February 20, 2003 plaintiff filed a grievance with the facility's inmate grievance review committee ("IGRC") complaining of the delay in receiving an MRI and the failure of prison officials to provide him with adequate treatment for his knee injury.  Following an investigation, that grievance was

---

[12]     Some of those complaints also addressed alleged harassment of the plaintiff by defendant Moon, who has been identified by Moody as a nurse administrator at the facility.  Since judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure was entered at the close of plaintiff's case dismissing Moody's claims against defendant Moon, those allegations will not be described or addressed in this decision.

accepted in part by the facility superintendent, who on February 26, 2003 noted that plaintiff had received an MRI two days previously and was "receiving appropriate care."  That determination was affirmed on appeal to the Central Office Review Committee ("CORC") on April 23, 2003, with a notation that the plaintiff had been referred for surgery on his knee, concluding that plaintiff's "medical concerns had been addressed by medical staff."

On February 24, 2003, shortly before receiving the superintendent's response to his grievance, plaintiff wrote to defendant Peter Behrle, who at the time was the Deputy Superintendent for Administration of Oneida, complaining of the delay in receiving treatment.[13]  Copies of that letter were forwarded by the plaintiff to Nurse Administrator Moon and Dr. Mara, a physician at the facility.  In response to his letter, Deputy Superintendent Behrle wrote to the plaintiff on March 3, 2003 noting that an MRI had been completed on February 24, 2003, and that upon receipt of its results his situation would be reviewed with him by a physician.

Plaintiff again wrote to Deputy Superintendent Behrle on March 23, 2003, inquiring about delays in being seen by a doctor or nurse practitioner

---

[13]    Defendant Behrle has since been promoted, and is currently the superintendent at another DOCS prison facility.

following a request for such an appointment, and additionally on March 26, 2003, pointing out that although it had been three and one-half weeks since his MRI was administered, he had yet to be apprised of the results.[14] Deputy Superintendent Behrle responded to plaintiff's letters of March 23, 2003 and March 26, 2003, pointing out that Moody was scheduled to be seen by an orthopedic specialist in April of 2003 to review his MRI test results and discuss the issue of what, if any, additional treatment was required, noting that in the interim plaintiff had been temporarily placed in the infirmary and was receiving appropriate care.

A second inmate grievance was filed by Moody on April 2, 2003, addressing the delay in receiving testing and treatment for his knee condition.  That grievance was denied by the facility superintendent, who in his response noted that discretion is used by medical personnel in the scheduling of appointments, and that the interval between the date of plaintiff's initial visit and his scheduled appointment with Nurse Practitioner Janicki on January 14, 2003 "was appropriate and within the acceptable timeframes given assessment at that time."  That determination was upheld

---

[14]     During her testimony, Nurse Practitioner Janicki candidly stated that she has voiced concerns over the length of time it customarily takes to receive reports back of such MRI testing.

on appeal by decision rendered by the CORC on May 21, 2003.

On April 7, 2003, plaintiff authored yet another letter to Deputy Superintendent Behrle, continuing to complain of the delay in receiving treatment and requesting that he not be placed into general population. That letter was referred to the facility's Deputy Superintendent for Programs, W.F. Hulihan, who on April 9, 2003, responded, noting that plaintiff was scheduled to go to a clinic for treatment "in the near future" and that according to medical staff he would be permitted to remain in the infirmary until then, and consequently would not be required to participate in prison programs.

## II.   DISCUSSION

As the result of the issuance by me of a report and recommendation dated January 23, 2006, Dkt. No. 47, and its acceptance by Chief District Judge Norman A. Mordue on February 14, 2006, Dkt. No. 48, as well as the entry of judgment as a matter of law at trial dismissing all claims asserted by the plaintiff against Nurse Administrator Moon, the remaining issues in the case surround Nurse Practitioner Janicki's alleged refusal to comply with directives of Dr. Pickles, on January 14, 2003 and again on January 21, 2003, to order an immediate MRI and place the plaintiff in the infirmary, and

claims of retaliation by Nurse Practitioner Janicki in response to complaints lodged by the plaintiff regarding her conduct. Also implicated are plaintiff's claims against Deputy Superintendent Behrle, based principally upon his failure to intercede and prevent those constitutional violations, despite his awareness of them.[15]

## A.    Deliberate Indifference

Plaintiff's medical indifference claim is appropriately analyzed against the backdrop of a body of well-established Eighth Amendment jurisprudence. The Eighth Amendment proscribes the imposition of cruel and unusual punishments, including those that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing,

---

[15]    In their summary judgment motion defendants argued that dismissal of plaintiff's claims was warranted based upon his failure to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), before commencing this action. *See* 42 U.S.C. § 1997e(a). The portion of defendants' summary judgment motion seeking dismissal on this basis was denied in light of the court's finding of the existence of triable issues of material fact regarding the defense. At trial defendants did not press their argument regarding plaintiff's alleged failure to exhaust. In any event, it appears from the evidence adduced that plaintiff did satisfy his obligation under the PLRA to fully exhaust his claims, and this defense is therefore rejected.

*inter alia*, *Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *See Leach v. Dufrain*, 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also*, *generally*, *Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F.

Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at \*2 (same).

### 1.   Serious Physical Injury

In order to prove an Eighth Amendment violation based upon indifference to an inmate's medical requirements, a plaintiff must establish a deprivation involving a medical need which is, in objective terms, "'sufficiently serious'".  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).  A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*).  Relevant factors in making this determination include injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily

17

activities, or causes "'chronic and substantial pain.'" *Chance*, 43 F.3d at 701

(citation omitted); *LaFave v. Clinton County*, No. CIV. 9:00CV774, 2002 WL

31309244, at *2-*3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

The medical condition at issue in this case consists of a knee injury

diagnosed principally as medial meniscal tear, with joint effusion.  There is

no evidence that as a result of the injury plaintiff's knee was rendered

immobile, and in fact the evidence establishes that, to the contrary, plaintiff

was able to ambulate, both with and without a cane at various times, despite

his injury.

To the extent that plaintiff claims to have suffered "excruciating pain"

as a result of his injury, such claims are not supported by the chronology of

events and the relevant entries in his prison health records.  While it is clear

that plaintiff did complain of knee pain, his injury was not immobilizing, and

his visits to the Oneida clinic with complaints of knee pain were sporadic,

with intervals of up to one month or more between some of those visits.

Indeed, plaintiff's AHR reflects several visits by him to the clinic during the

relevant time frame complaining of other conditions, with no mention of his

knee, even in passing.  *See*, *e.g.*, AHR entries dated 1/13/03 (dandruff),

1/16/03 (medication renewal), 2/18/03 (stuffy nose), 4/14/03 (ear pain), and

4/15/03 (skin condition).

While, undoubtedly, plaintiff's knee injury caused him some modicum of pain, for which he was provided treatment, albeit conservative at the outset, and medication, the proof fails to establish the existence of a serious physical condition of constitutional proportion.  In that regard, I note that courts in this circuit have almost uniformly found similar knee injuries to be insufficient to trigger Eighth Amendment protection and to support a deliberate indifference claim.  *See*, *e.g.*, *Williamson v. Goord*, No. 9:02-CV-00521, 2006 WL 1977438, at *9-*16 (N.D.N.Y. July 11, 2006) (Sharpe, J. & Lowe, M.J.) (plaintiff's injuries, including arthrosis, degenerative joint disease in both knees, and a partially torn anterior cruciate ligament did not impose the risk of death or degeneration, or inflict severe pain, sufficient to satisfy the serious medical condition test); *Taylor v. Kurtz*, No. 00-CV-700, 2004 WL 2414847, at *1-*4 (W.D.N.Y. Oct. 28, 2004) (where plaintiff complained of failure to perform knee surgery until nine months after discovering the tear of a previously repaired anterior cruciate ligament, a torn lateral meniscus, and degenerative arthritis, plaintiff's injury found not to be sufficiently serious to satisfy the Eighth Amendment standard); *Espinal v. Coughlin*, No. 98 CIV. 2579, 2002 WL 10450, at *1-*5 (S.D.N.Y. Jan. 3, 2002) (ruptured anterior

19

cruciate ligament did not constitute severe injury for purposes of the Eighth Amendment despite a three year delay in performing surgery while more conservative treatment was attempted); *see also Culp v. Koenigsmann*, No. 99 Civ. 9557, 2000 WL 995495, at *4, *9-*10 (S.D.N.Y. July 19, 2000) (no Eighth Amendment violation where plaintiff suffered from a torn medial meniscus and experienced a one-year delay from injury to surgery).

Since the proof at trial failed both to distinguished plaintiff's knee condition from those found by this and other courts not to trigger Eighth Amendment protection, and to establish that his injury imposed risk of death or degeneration, or resulted in severe pain, I find that Moody did not suffer from a constitutionally significant serious physical need.  Plaintiff's deliberate indifference claim is therefore subject to dismissal on this basis.

## 2.    Deliberate Indifference

In addition to demonstrating the existence of a serious physical need, to prevail on his medical indifference claim plaintiff must additionally establish that defendants were deliberately indifferent to that condition. Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

It is well established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 201-02; *Chance*, 143 F.3d at 703; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040, 113 S. Ct. 828 (1992).  The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp.2d 261, 264 (W.D.N.Y. 1998).

Plaintiff contends that deliberate indifference has been established based upon proof of Nurse Practitioner Janicki's intentional disregard for his medical condition, manifested by his failure to follow instructives of Dr. Pickles issued on January 14, 2003 and again, he contends, on January 21,

21

2003, that immediate MRI testing of his right knee be conducted and that he be placed in the prison infirmary.  In this regard I credit the testimony of Dr. Pickles and Nurse Practitioner Janicki, to the effect that an MRI was not ordered on January 14, 2003, nor did Dr. Pickles instruct Nurse Practitioner Janicki on that or any other occasion to place Moody in the infirmary.  Dr. Pickles testified to the expense associated with an MRI and his practice not to order such testing when there is no knee immobilization noted and immediate surgical intervention was not contemplated.  Dr. Pickles also convincingly testified that he would not have given such instructives to Nurse Practitioner Janicki since, although she has less medical training than a prison physician, he regarded her as a colleague and that the plaintiff was her patient, noting that he was asked to examine Moody only because of the difficulty which defendant Janicki was experiencing in administering the appropriate testing.

I also accept the testimony of Dr. Pickles and Nurse Practitioner Janicki, which reflects their professional beliefs that resort to the more conservative course of treatment initially offered to the plaintiff was a reasonably prudent first step.  During that interim period leading up to Moody's surgery a non-invasive approach was taken to address his knee

condition, and he was provided with Ace wraps, an elastic knee brace, pain medication, and a cane to assist him to ambulate.  When ambulation became difficult plaintiff was placed in the prison infirmary, and taken off his work assignment and other prison programming.  Finally, when it was determined that plaintiff's condition had not improved appreciably despite those measures, an orthopedic consultation was ordered, and surgery was ultimately performed.

The court has carefully considered the chronology of relevant events and the delay in providing MRI testing and surgical intervention.  Delays and interruptions in medical treatment of an inmate's medical condition, however, do not necessarily provide a basis for an Eighth Amendment claim.  *See Smith v. Carpenter*, 316 F.3d 178, 184-87 (2d Cir. 2003).  Where a plaintiff complains of delays or interruptions in providing needed medical treatment, the court should consider the severity of the "challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone" in determining whether plaintiff has shown the existence of a sufficiently serious medical need.  *Smith*, 316 F.3d at 185 (emphasis in original).  Although a delay or interruption in medical care may amount to deliberate indifference, the Second Circuit has reserved such a classification for cases

in which, for example, officials deliberately delayed care as a form of punishment, ignored a "life-threatening and fast-degenerating" condition for three days, or delayed major surgery for over two years. *Liscio v. Warren*, 901 F.2d 274, 277 (2d Cir. 1990); *Hathaway*, 841 F.2d at 50-51; *Archer v. Dutcher*, 733 F.2d 14, 16-17 (2d Cir. 1984). The evidence presented at trial, fell well short of meeting this requirement.

In sum, even had plaintiff been able to establish the existence of a serious medical condition of constitutional significance, the evidence at trial failed to establish that either Nurse Practitioner Janicki or Dr. Pickles was deliberately indifferent to plaintiff's condition. And, since plaintiff's deliberate indifference claims against defendant Behrle hinge upon proof of indifference on the part of one or both of those defendants and his failure to intercede, Moody's claims against him are also subject to dismissal.

B.    Retaliation

Although not containing a discrete cause of action denominated as such, I have generously construed plaintiff's complaint, and in particular its reference to the First Amendment, to include a claim of unlawful retaliation. To the extent that that retaliation claim is asserted based upon actions taken by defendant Moon, that portion of it has been dismissed. The remaining

24

element of that claim relates to Nurse Practitioner Janicki's alleged refusal to provide plaintiff with requested treatment for his knee in retaliation for his having registered complaints regarding her care and treatment.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

25

While it is clear that Moody did complain of treatment rendered by defendant Janicki, and thus engaged in activity protected by the First Amendment, *Graham*, 89 F.3d at 80, the trial record contains no evidence of any adverse actions taken by Nurse Practitioner Janicki against the plaintiff as a result of his complaints. Instead, at trial defendants convincingly established that Moody received the care and treatment which would have obtained, regardless of whether or not such complaints were registered. Under these circumstances, I find that plaintiff has not demonstrated the existence of retaliation by a fair preponderance of the evidence, and that in any event defendant Janicki has carried her burden of proving that regardless of any retaliatory animus he received the same treatment as would have been provided even absent such motivation.

III.    <u>SUMMARY AND CONCLUSION</u>

Based upon the evidence at trial I find that plaintiff has failed to carry his burden of demonstrating either the existence of a serious medical need or deliberate indifference on the part of the remaining defendants in the action to any such need, and therefore will direct dismissal of plaintiff's Eighth Amendment deliberate indifference claim.  Similarly, I find no basis to conclude that adverse action was taken against the plaintiff by Nurse

Practitioner Janicki based upon plaintiff's complaints regarding her care and treatment of his knee, and therefore will order dismissal of plaintiff's retaliation claim as well.

Based upon the foregoing it is hereby

ORDERED, that the clerk enter judgment in defendants' favor DISMISSING plaintiff's remaining claims in all respects.

David E. Peebles
U.S. Magistrate Judge

Dated:      September 13, 2006
            Syracuse, NY

G:\trial\trials\moody\dec.wpd

27